## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JOHN P. ELMENSDORP, individually and on behalf of all others similarly situated, <br><br>             Plaintiff, <br><br>     v. <br><br> CARNIVAL CORPORATION, CARNIVAL PLC, ARNOLD W. DONALD, DAVID BERNSTEIN, and MICKY ARISON, <br><br>             Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff John P. Elmensdorp ("Plaintiff"), by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (1) regulatory filings made by Carnival Corporation and Carnival plc (together, "Carnival" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) press releases, presentations, and media reports issued by and disseminated by the Company; (3) analyst and media reports concerning Carnival; and (4) other public information regarding the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired Carnival's common stock (NYSE: CCL) and/or Carnival's American Depository Shares ("ADSs") (NYSE: CUK) between September 26, 2019, and April

30, 2020, inclusive (the "Class Period").  Plaintiff brings this class action to recover damages proximately caused to himself (and the Class) resulting from violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as a result of false and misleading statements made by or on behalf of: (1) Defendant Carnival; (2) Defendant Arnold W. Donald ("Donald"), the Company's President and Chief Executive Officer, and a Company director; (3) Defendant David Bernstein ("Bernstein"), the Company's Chief Financial Officer; and (4) Defendant Micky Arison ("Arison"), the Company's Chairman of the Boards of Directors.

2.      Carnival, headquartered in Miami, Florida, operates the world's largest cruise company, carrying nearly forty-five percent of global cruise passengers through nine different business segments, including Carnival Cruise Line, Princess Cruises, Holland America Line, Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK), and Cunard.  The Company boasts that it is "the leading provider of vacations to all major cruise destinations throughout the world."

3.      Carnival has repeatedly assured investors and passengers that it follows the highest safety standards to ensure passengers' health, safety, and comfort while aboard its ships. The Company has also linked health, safety, and comfort to its profitability, admitting that "[Carnival's] commitment to the safety and comfort of our guests and crew is paramount to the success of our business. . . ."

4.      Notwithstanding these assurances, the Centers for Disease Control and Prevention ("CDC") identified multiple instances of norovirus outbreaks on cruise ships owned or operated by Carnival in 2019, including: three outbreaks on AIDA Cruises (AIDAdiva and AIDAluna), one

outbreak on Carnival Cruise Line (Conquest), and one outbreak on Princess Cruises (Island Princess).[1]

5.      Three out of the five outbreaks on Carnival ships occurred before the start of the Class Period, and the CDC investigation and reported data clearly put Carnival on notice of the threat of infectious diseases on its ships.

6.      According to data on the CDC's website under the heading "Investigation Update," the 2019 outbreaks occurred on: (1) Carnival Cruise Line (Conquest), voyage occurred September 7–14, 2019; (2) Princess Cruises (Island Princess), voyage occurred February 8–18, 2019; and (3) the Royal Caribbean (Oasis of the Seas), voyage occurred January 6–13, 2019.

7.      Despite these investigations and reports, and as described below, Carnival re-emphasized is commitments to the health, safety, and comfort of its passengers and crew members, but made no mention of its actual inability to contain the threat of infectious illnesses on its ships and its need to downplay outbreaks to maintain bookings and reservations.

8.      The recent outbreak of the novel coronavirus, COVID-19, has exposed Carnival's omissions as well as its assurances to safeguarding passengers and crew and, thereby its profitability, as false and/or misleading.

9.      The Class Period begins on September 26, 2019, when Carnival filed its Form 10-Q for the quarterly period ended August 31, 2019, and a Form 8-K, in which the Company purported to describe all the primary risks that potentially could impact the Company and its shareholders (in identical lists), yet the 10-Q and 8-K entirely omitted any reference to the potential

---

[1] *See* "CDC Cruise Ship Outbreak Summary," Shipdetective.com, *available at* http://www.shipdetective.com/ships/cdc/outbreak_summay_cruise_ships.htm.

harm to shareholders that would be caused by the Company's inadequate facilities and preparation for a viral infection and/or other outbreaks of diseases on one or more of its ships.

10.     These omissions were consistent with a host of pre-Class Period statements wherein the Company stated that the welfare of its passengers was paramount, but omitted any reference to the Company's inability to adequately address the spread of infectious disease among passengers and crew members on its ships.  For example, the Company's 2018 Form 10-K filed with the SEC on January 28, 2019, consistent with Defendants' past statements, made numerous representations about the Company's commitment to the health and safety of its guests and crew members, but made no references to the threat of infectious disease or the susceptibility of its own ships to infectious disease and/or its inability to control such outbreaks (the "2018 10-K").  The 2018 10-K also failed to disclose that the Company lacked effective means to control an outbreak of an infectious disease on its ships, and that an outbreak on any of its ships due to an infectious disease could harm its passengers and crew and lead to death.  The Company's 2019 Form 10-K, filed with the SEC on January 28, 2020, during the Class Period, repeated the same statements and omissions (the "2019 10-K").

11.     In fact, on January 27, 2020, as COVID-19 spread beyond China, the Company claimed that the risks of COVID-19 posed to the Company's guests, crew, and global business were "very low."

12.     The Company also launched several cruise ships in early 2020, putting tens of thousands of passengers and crew at serious risk and turned Carnival's ships into vessels for seeding the virus across the globe.  *See* Austin Carr and Chris Palmeri, "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going," *Bloomberg Businessweek*, April 16, 2020, accessed here: https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/.

13.     Investors began to learn the relevant truth about the Company's disregard for health and safety when operating its cruise ships and selling and retaining reservations, including the Company's disregard for the true risks of COVID-19, through a series of disclosures beginning on February 3, 2020, when the Company admitted that a passenger who had recently been onboard the Company's Diamond Princess cruise ship, then docked in Yokohama, Japan, had tested positive for COVID-19 after disembarking.  The revelation forced Carnival to sequester passengers and crew while Japanese authorities examined other guests and crew members for the virus. Ultimately, more than 700 cases of COVID-19 (nearly 20% of people aboard the ship)—and at least fourteen deaths—were connected to the Diamond Princess outbreak.

14.     On this news, the price of Carnival's common stock declined $0.78 per share, or approximately 2%, from a close of $43.53 per share on January 31, 2020, to close at $42.75 per share on February 3, 2020.  Similarly, the price of Carnival's ADSs declined $0.45 per share, or 1.1%, from a close of $41.10 per ADS on January 31, 2020, to close at $40.65 per ADS on February 3, 2020.

15.     Notwithstanding the investigation by Japanese authorities, the quarantine of one of Carnival's ships in or near Yokohama, Japan, and international media reports of an ever-increasing global pandemic, Carnival continued to operate many of its ships during subsequent weeks, which experienced additional outbreaks of COVID-19 and deaths.

16.     Notably, on March 4, 2020, the Company announced that the CDC was investigating a cluster of COVID-19 cases in connection with passengers who had recently traveled on the Company's Grand Princess ship, then docked in or near the Port of San Francisco, California—and, further, that dozens of passengers and crew members on the Grand Princess's

current voyage were also experiencing symptoms.  More than 100 COVID-19 cases, and multiple deaths, were eventually connected to the Grand Princess.

17.     In response to these disclosures, the price of Carnival's common stock declined $4.59 per share, or 14.1%, from a close of $32.46 per share on March 4, 2020, to close at $27.87 per share on March 5, 2020.  Similarly, the price of Carnival's ADSs declined $3.96 per ADS, or 12.9%, from a close of $30.58 per ADS on March 4, 2020, to close at $26.62 per ADS on March 5, 2020.

18.     Evidence revealing how Carnival's conduct allowed outbreaks on its ships to spread also surfaced.  For example, on March 8, 2020, *The New York Times* reported that the Diamond Princess quarantine failed, at least in part, due to Carnival's mishandling of the outbreak—in light of known risks—despite Carnival's false assurances that risks on its cruises were "very low."

19.     On this news, the price of Carnival's common stock declined $5.41 per share, or 19.9%, from a close of $27.15 per share on March 6, 2020, to close at $21.74 per share on March 9, 2020.  Similarly, the price of Carnival's ADSs declined $2.46 per ADS, or 19.7%, from a close of $12.48 per ADS on March 6, 2020, to close at $10.02 per ADS on March 9, 2020.

20.     COVID-19 outbreaks on Carnival ships continued and, on March 27, 2020, the Company revealed that four passengers on its MS Zaandam ship had died, with additional confirmed cases of COVID-19 onboard, and many more people exhibiting symptoms.

21.     On this news, the price of Carnival's common stock declined $3.41 per share, or 19.1%, from a close of $17.82 per share on March 26, 2020, to close at $14.41 per share on March 27, 2020.  Similarly, the price of Carnival's ADSs declined $2.58 per ADS, or 17.3%, from a close of $14.88 per ADS on March 26, 2020, to close at $12.30 per ADS on March 27, 2020.

22.     Additional information emerged on April 16, 2020, when *Bloomberg Businessweek* detailed the Company's many failures in handling COVID-19 outbreaks.  Among other things, this article also exposed Defendants' efforts to downplay the seriousness of the virus and the effects of outbreaks on Carnival ships.

23.     In response to the revelations in the *Bloomberg* article, the price of Carnival's common stock declined $0.53 per share, or 4.3%, from a close of $12.38 per share on April 15, 2020, to close at $11.85 per share on April 16, 2020.  Similarly, the price of Carnival's ADSs declined $0.41 per ADS, or 3.6%, from a close of $11.33 per ADS on April 15, 2020, to close at $10.92 per ADS on April 16, 2020.

24.     On May 1, 2020, and as a result of the many outbreaks on Carnival ships, as well as reporting that exposed the effects of Carnival's actions and inactions, the United States House of Representatives opened an investigation into Carnival's handling of COVID-19, initiated by a letter addressed to Carnival's chief executive officer requesting records regarding the Company's COVID-19 response (the "Congressional Letter").  The Congressional Letter, which cited prior outbreaks, stated that the request for records was based on concerns that Carnival was "ignoring the public health threat posed by coronavirus to potential future passengers and crew," and that "officials at Carnival were aware of the threats to some of its ships and did not take appropriate actions, which may have led to greater infections and the spread of the disease."

25.     On this news, the price of Carnival's common stock declined $1.97 per share, or 12.4%, from a close of $15.90 per share on April 30, 2020, to close at $13.93 per share on May 1, 2020.  Similarly, the price of Carnival's ADSs declined $1.49 per ADS, or 10.7%, from a close of $13.92 per ADS on April 30, 2020, to close at $12.43 per ADS on May 1, 2020.

26.     In total, at least nineteen Carnival ships have been connected to nearly 2000 reported cases of COVID-19 and at least fifty-eight deaths, and investors have suffered substantial losses in response to the Company's assurances about its commitments to the health and safety of its passengers and crew and subsequent statements in the midst of the COVID-19 epidemic by downplaying the threat of COVID-19 on its ships.

27.     In addition to the Congressional investigation, the Company is also the subject of civil lawsuits by passengers on COVID-19 infected ships and at least one criminal investigation by officials in Australia, looking into why Carnival permitted nearly 2,700 passengers to disembark a cruise ship in Sydney on or about March 19, 2020, creating a coronavirus hotbed in Australia.

28.     As a result of the revelation of the truth about Carnival's inability and unwillingness to deal with the spread of infectious diseases on its ships, investors who purchased shares on U.S. exchanges lost billions of dollars when the Company's shares declined following the corrective revelations.

## I.     **JURISDICTION AND VENUE**

29.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

30.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

31.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Carnival Corporation is headquartered in this District, Defendants conduct business in this District, and many of the acts and conduct that constitute the

violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

32.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## II.     **PARTIES**

33.     Plaintiff John P. Elmensdorp is a citizen of the state of California.  As indicated on the certification submitted herewith, Plaintiff purchased Carnival common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

34.     Defendant Carnival Corporation is incorporated in the Republic of Panama, and headquartered in Miami, Florida.

35.     Defendant Carnival plc is incorporated in England and Wales, and headquartered in Southampton, England.

36.     Defendants Carnival Corporation and Carnival plc operate a dual-listed company called "Carnival Corporation & plc," which operates as "a single economic enterprise with a single senior executive management team and identical Boards of Directors."[2]  Defendants Carnival Corporation and Carnival plc are collectively referred to hereafter as "Carnival" or the "Company."

37.     Defendant Arnold W. Donald is the Company's President and Chief Executive Officer, and a Company director.

---

[2] *See* Carnival Corporation & plc, Form 10-K filed Jan. 28, 2020.

38.     Defendant David Bernstein is the Company's Chief Financial Officer.

39.     Defendant Micky Arison is the Company's Chairman of the Boards of Directors.

40.     Defendants Donald, Bernstein, and Arison are collectively referred to hereafter as the "Individual Defendants."

41.     The Individual Defendants, because of their positions with Carnival, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

42.     Carnival and the Individual Defendants are collectively referred to hereafter as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

43.     Carnival's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CCL," while Carnival's ADSs trade on the NYSE under the ticker symbol "CUK."

44.     Norovirus and other communicable diseases are not new public health threats to the cruise line industry.  In 2010, the World Health Organization ("WHO") identified norovirus and

influenza outbreaks as "the major public health challenges for the cruise industry."[3]   This

assessment was made a decade before COVID-19 emerged.

45.     In SEC filings going back to at least 2014, the Company has long touted its

commitment to the health, safety, and comfort of its passengers and crew.

46.     More recently, in Carnival's 2018 10-K, filed with the SEC on January 28, 2019,

the Company made numerous representations that the Company remained committed to the health,

safety, and comfort of its guests and crew, including:

- "Our commitment to the safety and comfort of our guests and crew is paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business."

- "Health, Safety and Security Goals: Continue to build on our commitment to protect the health, safety and security of guests, employees and all others working on our behalf."

- "To ensure that we are compliant with legal and regulatory requirements and that these areas of our business operate in an efficient manner we: [1] Provide regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf. [2] Develop and implement effective and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments. [3] Perform regular shoreside and shipboard audits and take appropriate action when deficiencies are identified. [4] Report and investigate all health, environmental, safety and security incidents and take appropriate action to prevent recurrence. [5] Identify those employees responsible for managing health, safety, environment, security and sustainability programs and ensure that there are clear lines of accountability."

- "We have implemented and continue to enhance policies and procedures that demonstrate our commitment to the safety of our guests and crew. These policies and procedures include the following: [. . .] Identifying and standardizing best-practice policies and procedures in health, environment,

---

[3] Ross Dowling and Clare Weeden, "Cruise Ship Tourism," (2nd Edition), 2017, *available at* https://books.google.com/books?hl=en&lr=&id=ePMsDgAAQBAJ&oi=fnd&pg=PA220&dq=cruise+ship+health+s.

safety and security disciplines across the entire organization including on all our ships."

- "We are committed to providing a healthy environment for all of our guests and crew. We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention in the U.S. ('CDC') and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships."

47.     The Company also advised investors that Carnival's commitment to ensuring the health and safety of its passengers and crew is "[p]aramount to the success of our business."

48.     Despite these assurances made at the start of 2019, Carnival-owned ships experienced more reported outbreaks of infectious diseases during 2019 than any other cruise line.

49.     The CDC identified ten instances of norovirus outbreaks on cruise ships in 2019. Five of the ten 2019 norovirus outbreaks occurred on three Carnival owned cruise lines, including three outbreaks on AIDA Cruises (AIDAdiva and AIDAluna), one outbreak on Carnival Cruise Lines (Conquest), and one outbreak on Princess Cruises (Island Princess).  On its website, the CDC provides investigative reports for each outbreak, titled "Outbreak Updates" and subtitled "Investigation Updates," which contain data, among other things, identifying the name of the ship and the date of the trip, the number of passengers and crew affected, predominant symptoms, cause (norovirus), and the actions taken by the crew during the cruise.  As noted, three out of the five Carnival-owned ships and voyages identified by the CDC for 2019 occurred before the start of the Class Period.  *See supra* Complaint ¶¶ 4–6 (summarizing CDC data regarding Carnival cruise ships and voyage dates).

50.     Notwithstanding that half of the incidents at sea investigated and reported by the CDC in 2019 concerned Carnival cruise ships, Carnival never addressed the issues or updated its statements regarding the Company's purported commitments to the health, safety, and comfort of its passengers and crew.

51.     At the beginning of the Class Period on September 26, 2019, and consistent with its historical failure to disclose life-threatening issues related to its unwillingness and inability to address infectious disease concerns on its ships, Carnival filed a Form 10-Q and a Form 8-K with the SEC that purported to describe all of the "risks" facing the Company, yet both Forms contained a verbatim list of risks that wholly omitted any reference to the susceptibility of its ships to the transmission of infectious diseases among passengers and crew and to the Company's manifest inability to address the spread of infectious diseases on its ships.

52.     In December 2019, a novel strain of coronavirus, which causes an illness now known as COVID-19, was first reported in Wuhan, Hubei province, China.[4] On January 11, 2020, China reported its first death.  On January 20, 2020, the WHO and media outlets reported that confirmed cases of COVID-19 were discovered outside of mainland China—in Japan, South Korea, and Thailand.  On January 21, 2020, the first United States citizen, in Washington State, was diagnosed with the illness.

53.     COVID-19 quickly spread to numerous countries and has since been designated a global pandemic by the WHO.[5]

54.     On January 27, 2020, as reported by Jonathan Levin, reporter for *Bloomberg*, Carnival stated: "***Although the risks to our guests, crew and business around the world is very low***, we are closely monitoring the situation" (emphasis added).[6]

---

[4] Derrick Bryson Taylor, *A Timeline of the Coronavirus*, THE NEW YORK TIMES (Mar. 19, 2020), *available at* https://www.nytimes.com/article/coronavirus-timeline.html.

[5] *Id.*

[6] Jonathan Levin, *Carnival's Costa Cruises Suspends Nine Departures from China*, BLOOMBERG (Jan. 27, 2020); *see also* Matthew Arrojas, *Cruise Stocks Fall As Carnival, Royal Caribbean, Norwegian Cancel Trips Due To Coronavirus Outbreak*, SOUTH FLORIDA BUSINESS JOURNAL (Jan. 28, 2020).

55.     Despite various reports of an ever-increasing global outbreak, Carnival restated all the assurances it made in its 2018 10-K verbatim in the Company's 2019 10-K, filed with the SEC on January 28, 2020,[7] with the addition of a single phrase in italics below:

- "Our commitments to the safety and comfort of our guests and crew *and protecting the environment are* paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business."

- "Health, Safety and Security Goals: Continue to build on our commitment to protect the health, safety and security of guests, employees and all others working on our behalf."

- "To ensure that we are compliant with legal and regulatory requirements and that these areas of our business operate in an efficient manner we: [1] Provide regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf. [2] Develop and implement effective and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments. [3] Perform regular shoreside and shipboard audits and take appropriate action when deficiencies are identified. [4] Report and investigate all health, environmental, safety and security incidents and take appropriate action to prevent recurrence. [5] Identify those employees responsible for managing health, safety, environment, security and sustainability programs and ensure that there are clear lines of accountability."

- "We have implemented and continue to enhance policies and procedures that demonstrate our commitment to the safety of our guests and crew. These policies and procedures include the following: [. . .] Identifying and standardizing best-practice policies and procedures in health, environment, safety and security disciplines across the entire organization including on all our ships."

  "We are committed to providing a healthy environment for all of our guests and crew. We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention in the U.S. ('CDC') and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships."

---

[7] The Individual Defendants, among others, signed the 2019 10-K.

56.     On January 31, 2020, China's envoy to the United Nations attested that there had been more than 9,800 confirmed cases of the virus in China, with 213 deaths. News reports that day indicated that the virus had spread to at least eighteen other countries.

57.     Carnival continued to double-down on its statements of "low risk" throughout the next two months by permitting cruises to continue (except those traveling to and from China or where quarantined by authorities) in the face of mounting cruise passenger illnesses and deaths on its ships due to COVID-19, or soon after disembarking its ships.

58.     On February 3, 2020, just a few days after the Company reiterated that COVID-19 was "very low" risk to the Company's guests, crew, and business, the Company admitted that a passenger who had been onboard the Company's Diamond Princess ship, from January 20, 2020, through January 25, 2020, had tested positive for COVID-19.

59.     This diagnosis caused Japanese authorities to conduct a review of all guests and crew as the ship was docked in Yokohama, Japan, causing a delay in the next leg of the ship's journey.[8]

60.     On this news, the price of Carnival's common stock declined $0.78 per share, or approximately 2%, from a close of $43.53 per share on January 31, 2020, to close at $42.75 per share on February 3, 2020.  Similarly, the price of Carnival's ADSs declined $0.45 per share, or 1.1%, from a close of $41.10 per ADS on January 31, 2020, to close at $40.65 per ADS on February 3, 2020.

---

[8] Jonathan Levin, *Coronavirus Sickened Cruise Customer on Carnival's Princess Line*, BLOOMBERG (Feb. 3, 2020), *available at* https://www.bloomberg.com/news/articles/2020-02-03/coronavirus-sickened-cruise-customer-on-carnival-s-princess-line.

61.     During the investigation of the Diamond Princess, Japanese authorities discovered that at least nine guests and one crew member had tested positive for COVID-19.[9]  Accordingly, the ship was quarantined in the port for two weeks in mid-February 2020, and the remainder of the trip canceled.[10]

62.     Despite the purported quarantine, at least 712 Diamond Princess passengers and crew members ultimately contracted COVID-19, resulting in at least fourteen deaths.[11]

63.     On February 12, 2020, the Company issued a press release titled "Carnival Corporation & plc Update On Financial Impact Of Coronavirus," which stated in relevant part:

> Carnival Corporation & plc is closely monitoring the evolving situation with respect to Coronavirus. The safety of guests and employees, compliance and protecting the environment are top priorities for the company. The company's medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement enhanced screening, prevention and control measures for its guests, crew and ships. The company's global team is working tirelessly to support guests impacted by voyage disruptions during this unprecedented time.

64.     On March 4, 2020, the Company announced that the CDC was investigating a cluster of COVID-19 cases connected with the Company's Grand Princess ship, located temporarily within or near the Port of San Francisco, California.[12]  Specifically, a passenger on the Grand Princess's prior voyage—which sailed from February 11, 2020, through February 21,

---

[9]  *Confirmed Cases of Coronavirus on Diamond Princess* (Feb. 4, 2020), *available at* https://www.princess.com/news/notices_and_advisories/notices/diamond-princess-update.html.

[10]  *Id.*

[11]  *About the Present Situation of New Coronavirus Infectious Disease (April 25, 2nd Edition)*, JAPANESE MINISTRY OF HEALTH, LABOUR, AND WELFARE (Apr. 25, 2020), *available at* https://www.mhlw.go.jp/stf/newpage_11043.html.

[12]  *See Grand Princess Health Advisory* (Mar. 4, 2020), *available at* https://www.princess.com/news/notices_and_advisories/notices/grand-princess-updates.html.

2020—had died from COVID-19 on March 4, 2020, and the CDC was investigating additional coronavirus patients in Northern California who had been passengers on the same ship.[13]

65.     Later that day, during a press conference after market hours, California Governor Gavin Newsom further revealed that twenty-one passengers and crew members on the Grand Princess's **current** voyage were also showing COVID-19 symptoms, and that the ship would be held off the coast of San Francisco while public health officials prepared to screen everyone aboard the ship.[14]

66.     The Company also announced that the CDC had identified certain current guests and crew members who would be tested for COVID-19, and that the U.S. Coast Guard would deliver testing kits to the ship via helicopter.

67.     Further, the Company cancelled the Grand Princess's next voyage, set to depart on March 7, 2020.[15]

68.     In response to these disclosures, the price of Carnival's common stock declined $4.59 per share, or 14.1%, from a close of $32.46 per share on March 4, 2020, to close at $27.87 per share on March 5, 2020.  Similarly, the price of Carnival's ADSs declined $3.96 per ADS, or 12.9%, from a close of $30.58 per ADS on March 4, 2020, to close at $26.62 per ADS on March 5, 2020.

---

[13] *See* John Bacon & Jorge L. Ortiz, *Coronavirus Live Updates: US Death Toll Hits 11, Including First in California, Which Declares State of Emergency*, USA TODAY (Mar. 4, 2020), *available at* https://www.usatoday.com/story/news/health/2020/03/04/coronavirus-live-updates-washington-outbreak-amazon-schools-vaccine-facebook/4940378002/.

[14] *See* Sarah Mervosh & Mitch Smith, *California Reports First Coronavirus Death as Symptoms Swirl on Cruise Ship*, THE NEW YORK TIMES (Mar. 5, 2020), *available at* https://www.nytimes.com/2020/03/04/us/coronavirus-california.html.

[15] *See Grand Princess Update* (Mar. 4, 2020), *available at* https://www.princess.com/news/notices_and_advisories/notices/grand-princess-updates.html.

69.     Ultimately, more than 100 Grand Princess passengers were confirmed to have contracted COVID-19, resulting in multiple deaths.[16]

70.     Additional details concerning Carnival's role in causing, exacerbating, and failing to protect passengers in its care from outbreaks emerged on March 8, 2020, when *The New York Times* reported that the Diamond Princess quarantine failed, at least in part, because the Company had, among other things: (1) ignored an email from a port representative notifying the Company that one of its Diamond Princess passengers had tested positive for COVID-19; (2) incorrectly assumed that the risk was minimal; (3) initiated only the lowest-level cleaning protocols for outbreaks; (4) failed to provide sufficient protective gear for its crew members; and (5) delayed announcing the infection and placing restrictions on passengers, giving the virus time to spread while passengers moved freely and continued to attend parties and performances.[17]

71.     On this news, the price of Carnival's common stock declined $5.41 per share, or 19.9%, from a close of $27.15 per share on March 6, 2020, to close at $21.74 per share on March 9, 2020.  Similarly, the price of Carnival's ADSs declined $2.46 per ADS, or 19.7%, from a close of $12.48 per ADS on March 6, 2020, to close at $10.02 per ADS on March 9, 2020.

72.     On March 13, 2020, the Company announced a pause in operations of the Carnival Cruise Line, stating in an official press release:

> [W]e have implemented higher and higher levels of screening, monitoring and sanitation protocols to protect the health and safety of our guests, crew and the communities we serve.  ***While Carnival has not had a diagnosed case linked to our operation*** we realize this situation is bigger than the cruise industry and we will

---

[16]  *See* Morgan Hines, *U.S. Congress Announces Investigation into Carnival Corp. Response to COVID-19 Outbreak*, USA TODAY (May 1, 2020), *available at* https://www.usatoday.com/ story/travel/cruises/2020/05/01/coronavirus-congress-investigate-carnival-corp-s-virus-response/3066565001/.

[17]  *See, e.g.*, Matt Apuzzo *et al.*, *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, THE NEW YORK TIMES (Mar. 8, 2020), *available at* https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html.

continue to do our part to support public officials to manage and contain this unprecedented public health challenge. [emphasis added][18]

73.     On March 27, 2020, the Company revealed the extent of a COVID-19 outbreak on yet another Carnival-owned cruise ship—the MS Zaandam—with four passengers dead, two confirmed cases of COVID-19 onboard, and more than 100 people reporting flu-like symptoms.[19]

74.     On this news, the price of Carnival's common stock declined $3.41 per share, or 19.1%, from a close of $17.82 per share on March 26, 2020, to close at $14.41 per share on March 27, 2020.  Similarly, the price of Carnival's ADSs declined $2.58 per ADS, or 17.3%, from a close of $14.88 per ADS on March 26, 2020, to close at $12.30 per ADS on March 27, 2020.

75.     Additional evidence detailing Carnival's failures surfaced on April 16, 2020, when *Bloomberg Businessweek* published a feature article extensively detailing the Company's many failures in handling the COVID-19 crisis, as well as its efforts to downplay the scope of its outbreaks and the effects of the Company's actions, or lack thereof.[20]

---

[18] *See Carnival Cruise Line Announces Pause In Service*, Carnival News Release (March 13, 2015) *available at* https://www.carnivalplc.com/news-releases/news-release-details/carnival-cruise-line-announces-pause-service; *see also Carnival Cruise Line Announces Pause in Service*, prnewswire.com (March 13, 2015) *available at* https://www.prnewswire.com/news-releases/carnival-cruise-line-announces-pause-in-service-301023389.html; Richard Danielson, *Carnival Suspends Cruises Because of Coronavirus, Halting All Cruises Out Of Port Tampa Bay*, tampabay.com (March 15, 2020) *available at* https://www.tampabay.com/news/business/2020/03/15/carnival-suspend-cruises-because-of-coronavirus/.

[19] *See* Hannah Sampson, *Four Passengers Have Died, Two Test Positive for COVID-19 on Cruise Ship Stranded off the Coast of Panama*, THE WASHINGTON POST (Mar. 27, 2020), *available at* https://www.washingtonpost.com/travel/2020/03/27/four-passengers-have-died-zaandam-cruise-ship-where-two-people-tested-positive-covid-19/.

[20] *See* Austin Carr & Chris Palmeri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, BLOOMBERG BUSINESSWEEK (Apr. 16, 2020), *available at* https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/.

76.     In addition to confirming prior reporting about the Company failing to act on the alert that a Diamond Princess passenger had tested positive, the *Bloomberg Businessweek* article revealed, for example, that the Company had also delayed in taking action on the Grand Princess, leaving passengers free to gather in groups of hundreds for events even after the ship had begun isolating people suspected of carrying the virus.[21]

77.     Moreover, the *Bloomberg Businessweek* article disclosed that Company executives failed to act promptly to halt the spread of the virus, including by cancelling cruises to Asian destinations other than mainland China, even though—according to John Padgett, the Company's Chief Experience and Innovation Officer—the Company had "insight into the global situation much earlier than most," due to Padgett's communication with a manufacturer in Wuhan on January 25, 2020.[22]

78.     Indeed, Padgett specifically noted that the Company's leadership, "including Arnold Donald, all knew about the scale of the coronavirus outbreak," as Padgett immediately relayed to them what he learned from the Wuhan manufacturer.[23]

79.     As such, the author observed that "several of the plagued Carnival ships didn't even begin their voyages until well after the company knew it was risky to do so," countering Defendants' arguments that Carnival could not have improved on its actions.[24]

80.     For this reason, CDC epidemiologist Cindy Friedman explained that she "ha[s] a hard time believing they're just a victim of happenstance."[25]  Friedman, who leads the CDC's

---

[21]   *See id.*

[22]   *Id.*

[23]   *Id.*

[24]   *Id.*

[25]   *Id.*

cruise ship task force, further stated that Carnival's actions had a "huge strain" on the United States.[26]

81.     Friedman also disputed Defendant Donald's claim that cruise ships do not spread disease more easily than other public spaces, stating that coronavirus infection rates have approached 20% on at least two Carnival ships—far higher than infection rates in supermarkets or subways.[27]

82.     Additionally, further contradicting Defendant Donald's prior representations about the Company's commitment to health and safety, the *Bloomberg Businessweek* article revealed that Donald was not even aware that the Company had failed 3% of the CDC's ship health inspections since 2016—a failure rate three times worse than competitor Royal Caribbean Cruises.[28]

83.     In short, the article revealed a longstanding corporate culture dedicated to "ke[eping] the party going" at the expense of issues Defendants had claimed were the Company's top priorities, including health and safety.[29]

84.     For example, though Defendants had long represented that the Company was deeply committed to sustainability and the environment, the article recounted that in 2017, the United States Department of Justice had "fined Carnival's Princess line a record $40 million for dumping oil-contaminated waste at sea and falsifying official discharge records to cover it up."[30]

---

[26] *Id.*

[27] *See id.*

[28] *See id.*

[29] *See id.*

[30] *Id.*

85.     Still, the Company continued dumping oil even *after* the ruling, resulting in a June 2019 guilty plea Defendant Donald entered on behalf of the Company and demonstrating Carnival's "tendency to cut corners on safety"—which were further demonstrated by the Company's failures in responding to the COVID-19 crisis.[31]

86.     In response to the revelations in the *Bloomberg Businessweek* article, the price of Carnival's common stock declined $0.53 per share, or 4.3%, from a close of $12.38 per share on April 15, 2020, to close at $11.85 per share on April 16, 2020.  Similarly, the price of Carnival's ADSs declined $0.41 per ADS, or 3.6%, from a close of $11.33 per ADS on April 15, 2020, to close at $10.92 per ADS on April 16, 2020.

87.     Incredibly, as of April 23, 2020, ***none*** of the front facing web pages from any of Carnival's nine affiliated cruise lines contained a single word about COVID-19, coronavirus, or the precautions Carnival intended to take once the CDC lifts its "No Sail Order" for cruise lines. Instead, these sites, at the time, displayed various images of couples dining and dancing, musicians entertaining, and lines of children holding hands and playing.[32]

88.     Thereafter, and as a result of the many COVID-19 outbreaks on Carnival ships and the subsequent reporting on Carnival's actions, the United States House of Representatives commenced an investigation into the Company's handling of COVID-19.  On May 1, 2020, Representative Peter A. DeFazio, who chairs the House Committee on Transportation and Infrastructure, and Representative Sean Patrick Maloney, Chair of the Subcommittee on Coast Guard and Maritime Transportation, sent the Congressional Letter to Defendant Donald requesting specific records regarding Carnival's COVID-19 response.

---

[31] *Id.*

[32] Congressional Letter at 3 (citing Carnival's webpages).

89.     Citing extensive public reporting—particularly the April 16, 2020 *Bloomberg Businessweek* article, which the letter called "quite disturbing"—the Congressional Letter stated that "it seems as though Carnival Corporation . . . is still trying to sell this cruise line fantasy and ignoring the public health threat posed by coronavirus to potential future passengers and crew."[33]

90.     Specifically, the Congressional Letter cited reports suggesting "that officials at Carnival were aware of the threats to some of its ships and did not take appropriate actions, which may have led to greater infections and the spread of the disease."[34]

91.     Accordingly, the Congressional Letter requested the records "[i]n order to gain a better understanding of how Carnival intends to protect passengers and crew once vessels resume sailing."[35]

92.     The Congressional Letter also made clear that the results of the COVID-19 pandemic were simply the newest manifestations of longstanding risks concealed by Carnival, observing that "[l]ong before the COVID-19 pandemic began to race around the world, affecting local communities, churches, cities, homes, hospitals, and cruise ships sailing at sea, the cruise industry had a problem managing, containing, and responding to public health outbreaks."[36]

93.     For example, the Congressional Letter stated, in 2019 alone, there were ten norovirus outbreaks on cruise ships—half of which were on ships owned by Carnival.[37]  Indeed,

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *See id.*

the Congressional Letter explained, "[c]ruise ships are a fertile breeding ground for infectious diseases due to their environmental conditions and physical structure."[38]

94.    Despite these obvious risks and the Company's admitted connection between passenger safety and profitability, Carnival had failed to "undertake a proactive approach in crisis management," and did not heed advice to "pay[] more attention to emerging health issues as well as preparing itself with comprehensive and exhaustive crisis management plans"—and had instead opted to focus on entertainment.[39]

95.    On this news, the price of Carnival's common stock declined $1.97 per share, or 12.4%, from a close of $15.90 per share on April 30, 2020, to close at $13.93 per share on May 1, 2020.  Similarly, the price of Carnival's ADSs declined $1.49 per ADS, or 10.7%, from a close of $13.92 per ADS on April 30, 2020, to close at $12.43 per ADS on May 1, 2020.

96.    In total, at least nineteen Carnival ships have been connected to nearly 2000 reported cases of COVID-19 and at least fifty-eight deaths.

97.    In addition to the Congressional investigation, the Company is also the subject of several civil lawsuits asserting, among other things, claims for wrongful death and that Carnival knew that the virus was spreading, people were already sick on the ship, and Carnival did not take proper safety precautions in the face of known dangers.  Carnival is also the focus of at least one criminal investigation by officials in Australia, looking into why Carnival permitted approximately 2,700 passengers to disembark a cruise ship in Sydney on or about March 19, 2020, creating or increasing the severity of an outbreak in Australia.

---

[38] *Id.*

[39] *Id.*

98.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock and ADSs, Plaintiff and other putative class members have suffered significant losses and damages.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

99.     Defendants made materially false and misleading statements and omissions to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100.    At the beginning of the Class Period on September 26, 2019, Carnival filed a quarterly report with the SEC on Form 10-Q that was signed by Defendants Donald and Bernstein.  On the same day, Carnival also filed with the SEC a Form 8-K announcing "RECORD THIRD QUARTER EARNINGS."   Consistent with its historical failure to disclose life-threatening issues related to its unwillingness and inability to address infectious disease concerns on its ships, Carnival's September 26, 2019 Form 10-Q and 8-K purported to describe all of the "risks" facing the Company and the value of its shares in verbatim lists, yet the Company wholly omitted any reference to its manifest inability to address the spread of infectious disease on its ships and the susceptibility of its ships to the transmission of such diseases among passengers. Defendants' failed to disclose material information that: (1) its ships were susceptible to contagious diseases due to the ships' environmental condition, physical structure, and reports by the CDC in 2019, prior to the Class Period, that three Carnival ships on separate voyages had already experienced an outbreak of norovirus; (2) the Company lacked effective means to control an outbreak of an infectious disease on its ships; and (3) an outbreak on any of its ships due to an infectious disease could harm its passengers and crew and lead to death.

101.     On January 28, 2020, Carnival filed its 2019 10-K with the SEC, which was signed by the Individual Defendants, among others.  The 2019 10-K stated that: "We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf."  Defendants' statements about the health and safety of its guests and crew were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) its ships were susceptible to contagious diseases due to the ships' environmental condition, physical structure, and reports by the CDC in 2019, prior to the Class Period, that three Carnival ships on separate voyages had already experienced an outbreak of norovirus; (2) the Company lacked effective means to control an outbreak of an infectious disease on its ships; and (3) an outbreak on any of its ships due to an infectious disease could harm its passengers and crew and lead to death.

102.     Carnival also stated in the 2019 10-K that: "We have implemented and continue to enhance policies and procedures that demonstrate our commitment to the safety of our guests and crew. These policies and procedures include the following: [. . .] Identifying and standardizing best-practice policies and procedures in health, environment, safety and security disciplines across the entire organization including on all our ships." Defendants' statements about the health and safety of its guests and crew were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) its ships were susceptible to contagious diseases due to the ships' environmental condition, physical structure, and reports by the CDC in 2019, prior to the Class Period, that three Carnival ships on separate voyages had already experienced an outbreak of norovirus; (2) the Company lacked effective means to control an outbreak of an infectious disease on its ships; and (3) an outbreak on any of its ships due to an infectious disease could harm its passengers and crew and lead to death.

103.    On January 27, 2020, Carnival stated to a reporter from *Bloomberg* covering the growing outbreak: "***Although the risks [of COVID-19] to our guests, crew and business around the world is very low***, we are closely monitoring the situation" (emphasis added).[40]   This statement was repeated the following day by at least one other media outlet and attributed to a spokesperson from Carnival.  Defendants' statement about the risks of COVID-19 to the health and safety of Carnival's guests and crew was materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) its ships were susceptible to contagious diseases, including COVID-19, due to the ships' environmental condition, physical structure, and reports by the CDC in 2019, prior to the Class Period, that three Carnival ships on separate voyages had already experienced an outbreak of norovirus; (2) the Company lacked effective means to control an outbreak of an infectious disease, including COVID-19, on its ships; (3) an outbreak of COVID-19 on any of its ships could harm its passengers and crew and lead to death; (4) prior to this statement being issued, Defendants were already made aware of the existence of COVID-19, that it had killed people in China, and that the virus was spreading from China to other countries; and (5) Defendants had already suspended at least nine cruises scheduled to depart from China through February 4, 2020.

104.    On January 31, 2020, in a statement released to the press and thereafter reported in articles on travelmarketreport.com and wusa9.com, Carnival again stated that: "***Although the risk to our guests and crew is low***, we are closely monitoring the evolving situation with respect to Coronavirus" (emphasis added).[41]  Defendants' statement about the risk of COVID-19 to the

---

[40] Jonathan Levin, *Carnival's Costa Cruises Suspends Nine Departures from China*, BLOOMBERG (Jan. 27, 2020); *see also* Matthew Arrojas, *Cruise Stocks Fall As Carnival, Royal Caribbean, Norwegian Cancel Trips Due To Coronavirus Outbreak*, SOUTH FLORIDA BUSINESS JOURNAL (Jan. 28, 2020).

[41] Jessica Montevago, *Cruise Lines and Hotels Make Changes Amid Coronavirus Outbreak*,

health and safety of Carnival's guests and crew was materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) its ships were susceptible to contagious diseases, including COVID-19, due to the ships' environmental condition, physical structure, and reports by the CDC in 2019, prior to the Class Period, that three Carnival ships on separate voyages had already experienced an outbreak of norovirus; (2) the Company lacked effective means to control an outbreak of an infectious disease, including COVID-19, on its ships; (3) an outbreak of COVID-19 on any of its ships could harm its passengers and crew and lead to death; (4) prior to January 31, 2020, Defendants were already made aware of the existence of COVID-19, that it had killed hundreds of people in China, and that the virus was spreading from China to at least eighteen other countries; (5) Defendants had already suspended at least nine cruises scheduled to depart from China through February 4, 2020; and (6) the WHO had designated COVID-19 a global health emergency.

105.    On March 13, 2020, Carnival stated in an official Press Release: "***While Carnival has not had a diagnosed case linked to our operation*** we realize this situation is bigger than the cruise industry and we will continue to do our part to support public officials to manage and contain this unprecedented public health challenge" (emphasis added).[42]  Defendants' statement

---

TRAVEL MARKET REPORT (Jan. 31, 2020), *available at* https://www.travelmarketreport.com/articles/Cruise-Lines-and-Hotels-Make-Changes-Amid-Coronavirus-Outbreak; *see also* https://www.wusa9.com/article/news/nation-world/carnival-royal-caribbean-restrictions-china-coronavirus/507-7b77496b-1651-4f06-ac95-57c10a3f53e3

[42] *See Carnival Cruise Line Announces Pause In Service*, Carnival News Release (March 13, 2015) *available at* https://www.carnivalplc.com/news-releases/news-release-details/carnival-cruise-line-announces-pause-service; *see also Carnival Cruise Line Announces Pause in Service*, prnewswire.com (March 13, 2015) *available at* https://www.prnewswire.com/news-releases/carnival-cruise-line-announces-pause-in-service-301023389.html; *see also* Richard Danielson, *Carnival Suspends Cruises Because of Coronavirus, Halting All Cruises Out Of Port Tampa Bay*, tampabay.com (March 15, 2020) *available at* https://www.tampabay.com/news/business/2020/03/15/carnival-suspend-cruises-because-of-coronavirus/.

that, as of March 13, 2020, Carnival had not had a single case linked to its operation was materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) Carnival had admitted on February 3, 2020, that a passenger who had been onboard the Company's Diamond Princess ship, from January 20, 2020 through January 25, 2020, had tested positive for COVID-19; (2) Japanese authorities, beginning in early February 2020, started an investigation into the Diamond Princess cruise, then docked in Yokohama, Japan, discovering that at least nine guests and one crew member had tested positive for COVID-19, leading to a two-week quarantine of the ship, in mid-February, 2020, and further investigation revealed that at least 712 Diamond Princess passengers and crew members had ultimately contracted COVID-19, resulting in at least fourteen deaths; and (3) on March 4, 2020, the Company announced that the CDC was investigating a cluster of COVID-19 cases connected with the Company's Grand Princess ship, located temporarily within or near the Port of San Francisco, California, at least in part because a passenger on the Grand Princess's prior voyage—which sailed from February 11, 2020 through February 21, 2020—had died from COVID-19 on March 4, 2020.

## VI.   LOSS CAUSATION / ECONOMIC LOSS

106.    During the Class Period, and as detailed herein, Defendants made materially false and misleading statements and omissions.  This artificially inflated the price of Carnival's common stock and ADSs operated as a fraud or deceit on the Class (as defined below).  Later, when the relevant truth of Defendants' prior false and misleading statements were disclosed to the market (on February 3, 2020, March 4, 2020, March 8, 2020, March 27, 2020, April 16, 2020, and May 1, 2020 as specifically set forth above), the price of Carnival's common stock and ADSs fell precipitously as the prior artificial inflation came out of the price over time.  As a result of their

purchases of Carnival's common stock and ADSs during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## VII.   CLASS ACTION ALLEGATIONS

107.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock and ADSs of Carnival during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Carnival and their families and affiliates.

108.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 25, 2020, Carnival had 527 million shares of common stock (NYSE: CCL) outstanding, and over 182 million ordinary shares outstanding, with one ADS (NYSE: CUK) representing one ordinary share, owned by hundreds or thousands of investors.

109.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)  Whether Defendants violated the Exchange Act;

(b)  Whether Defendants omitted and/or misrepresented material facts;

(c)  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)  Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)   Whether Defendants' conduct impacted the price of Carnival's common stock and ADSs;

(g)   Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)   The extent of damage sustained by Class members and the appropriate measure of damages.

110.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

111.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

112.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR**

113.   Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Carnival who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as

they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX.    PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET DOCTRINE

114.    At all relevant times, Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)  The omissions and misrepresentations were material;

(c)  The Company's common stock and ADSs traded in an efficient market;

(d)  The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock and ADSs; and

(e)  Plaintiff and the Class purchased Carnival's common stock and ADSs between the time Carnival and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

115.    At all relevant times, the market for Carnival's common stock and ADSs were efficient because: (1) as a regulated issuer, Carnival filed periodic public reports with the SEC; and (2) Carnival regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## X.    SCIENTER ALLEGATIONS

116.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Carnival's common stock and ADSs during the Class Period.

## XI.    CLAIMS AGAINST DEFENDANTS

### COUNT I:

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

117.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Carnival's common stock and ADSs at artificially inflated prices.

119.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock and ADSs in

an effort to maintain artificially high market prices for Carnival's common stock and ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

120.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

121.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Carnival's true condition from the investing public and to support the artificially inflated prices of the Company's common stock and ADSs.

123.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Carnival's common stock and ADSs.  Plaintiff and the Class would not have purchased the Company's common stock and ADSs at the prices they paid, or at all, had they been aware that the market prices for Carnival's common stock and ADSs had been artificially inflated by Defendants' fraudulent course of conduct.

124.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock and ADSs during the Class Period.

125.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II:

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

126.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

127.    The Individual Defendants acted as controlling persons of Carnival within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Carnival, the Individual Defendants had the power and ability to control the actions of Carnival and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

DATED: June 3, 2020

Respectfully submitted,

/s/ Zachary S. Bower
ZACHARY S. BOWER
Florida Bar No. 17506
zbower@carellabyrne.com
**CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.**
Security Building
117 NE 1st Avenue
Miami, Florida 33132-2125
Tel: (973) 994-1700
Fax:  (973) 994-1744

   and

James E. Cecchi
5 Becker Farm Road
Roseland, NJ 07068-1739
jcecchi@carellabyrne.com
Tel:  (973) 994-1700
Fax:  (973) 994-1744

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
Naumon A. Amjed
Ryan T. Degnan
Geoffrey C. Jarvis
Mark C. Franek
280 King of Prussia Road
Radnor, PA 19087
namjed@ktmc.com
gjarvis@ktmc.com
rdegnan@ktmc.com
mfranek@ktmc.com
Tel: (610) 667-7706
Fax: (610) 667-7056

*Counsel for Plaintiff John P. Elmensdorp*